UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CLEARWIRE SPECTRUM HOLDINGS II LLC<br>12920 SE 38th Street<br>Bellevue, Washington 98006,<br><br>      Plaintiff,<br><br>  v.<br><br>LORAIN COUNTY COMMUNITY COLLEGE<br>1005 North Abbe Road<br>Elyria, Ohio 44035,<br><br>      Defendant. | CASE NO.<br><br>JUDGE<br><br><br><br>**COMPLAINT** |

Plaintiff Clearwire Spectrum Holdings II LLC ("Clearwire II"), by its undersigned counsel, brings this complaint to remedy multiple breaches of contract by Defendant Lorain County Community College ("LCCC").

**NATURE OF THE ACTION**

1. LCCC holds a Federal Communications Commission ("FCC") license to use four unique "channels" of radio frequency in the Cleveland, Ohio area (the "License"). These licensed channels are part of the Educational Broadband Service ("EBS"), which is a range of spectrum that the FCC historically has licensed only to educational entities. Those entities, in turn, typically have leased the spectrum capacity authorized by their licenses to commercial entities.

2. Clearwire II is a subsidiary of T-Mobile US, Inc. ("T-Mobile"), a company that provides wireless communications services to more than one hundred million customers across the United States. Clearwire II's business is to acquire and hold spectrum use rights for itself and

1

other T-Mobile affiliates. Since 2007, LCCC has leased to Clearwire II the excess capacity on three of the four licensed channels at issue (the "Channels") pursuant to a written lease agreement with a 30-year term (the "Lease Agreement"), a copy of which is attached hereto as Exhibit A.[1]

3. The Lease Agreement guarantees that Clearwire II will make payments to LCCC and, in exchange, LCCC will provide various rights to Clearwire II. One of those rights is the right to deal exclusively with LCCC concerning the Channels during the lease term, which precludes LCCC from negotiating to sell and/or selling the License to any third party. It is critically important to Clearwire II to know who its contract counterparty will be for the full duration of the term. This is true for numerous reasons, including that it minimizes risk to T-Mobile's network. For example, if an EBS licensee goes bankrupt, T-Mobile may lose its lease and corresponding ability to broadcast over that spectrum. Thus, when entering into a lease agreement, T-Mobile considers the outlook of its potential counterparty and bargains to keep that counterparty. T-Mobile also has a strong interest in eliminating reputational and other risks associated with being forced into a business relationship with a counterparty not of its choosing. Accordingly, the Lease Agreement's exclusivity provision prohibits LCCC from "negotiat[ing] or contract[ing] with any third party"—*i.e.*, any party other than Clearwire II—"to lease, sell, assign, transfer or use any of the Capacity of the Channels" for the entirety of the 30-year term, unless Clearwire II decides not to renew the lease at any point. Ex. A § 3(a). The only exception to this prohibition is that LCCC may negotiate or contract with third parties to sell the License during the last 90 days of the term. *See id*.

---

[1] Clearwire II has filed the Lease Agreement with minor redactions to prevent the disclosure of Clearwire II's confidential trade secret information contained in its EBS lease agreements. *See* Ex. A § 14 ("CONFIDENTIALITY AND NON-DISCLOSURE").

4. The parties performed under the Lease Agreement for more than a decade without incident.

5. In April 2020, however, a new FCC rule went into effect that allows commercial entities to directly buy, sell, and hold EBS spectrum licenses. While the FCC rules changed, the Lease Agreement's prohibition on negotiating and contracting for a sale of the License did not.

6. In 2021, LCCC was approached by a third party—WCO Spectrum LLC ("WCO")—about purchasing LCCC's License, notwithstanding LCCC's contractual commitment to Clearwire II.

7. On August 10, 2021, WCO made its first non-binding proposal to purchase LCCC's License for $14.75 million. LCCC informed Clearwire II of that purported offer, and asked if Clearwire II was interested in acquiring the License. LCCC sought approximately $18 million for the License. Clearwire II declined to pay that amount and reminded LCCC of its exclusivity obligations under the Lease Agreement.

8. Despite that reminder, LCCC continued to engage with WCO. On March 16, 2023, LCCC sent Clearwire II a letter stating that WCO supposedly had offered to pay LCCC $20.1 million for the License, approximately 10% more than the amount LCCC previously had indicated it would accept from Clearwire II. WCO apparently had extended that purported offer on January 12, 2022, but LCCC and WCO continued to negotiate throughout 2022, and entered into various agreements with one another related to the negotiations and potential transaction. After receiving LCCC's letter, Clearwire II promptly informed LCCC that, under Section 3(a) of the Lease Agreement, no sale was permitted because Clearwire II had not notified LCCC that it would not renew the Lease Agreement. To the contrary, Clearwire II intends to perform under the Lease Agreement for the entirety of the lease term, as it may be extended from time to time. LCCC,

however, refused to comply with its exclusivity obligation and threatened to proceed with a sale of the License to WCO on or about April 15, 2023.  This would upend the parties' agreement to give Clearwire II the right to contract exclusively with LCCC with respect to the Channels for at least 14 more years.  In taking that position, LCCC never addressed how it could possibly complete a transaction with WCO without violating the exclusivity provision to which it agreed in 2007.

9. Thus, LCCC has both negotiated a sale of the License with WCO and is threatening to complete such a prohibited transaction unless Clearwire II matches WCO's supposed offer.  Because LCCC's conduct flatly breaches the exclusivity provision of the Lease Agreement, LCCC should be prohibited from entering into any such transaction with WCO.

## PARTIES

10. Plaintiff Clearwire Spectrum Holdings II LLC is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.  Clearwire II's sole member is Clearwire Legacy LLC, a limited liability company organized under the laws of Delaware.  Clearwire Legacy LLC's sole member is Clearwire Communications LLC, a limited liability company organized under the laws of Delaware.  Clearwire Communications LLC's sole member is Sprint Communications LLC, a limited liability company organized under the laws of Delaware.  Sprint Communications LLC's sole member is Sprint LLC, a limited liability company organized under the laws of Delaware.  Sprint LLC's sole member is T-Mobile USA, Inc., a Delaware corporation with its principal place of business located at 12920 SE 38th Street, Bellevue, Washington 98006.  Accordingly, Clearwire II is a citizen of Delaware, Washington, and no other state.  Clearwire II is a T-Mobile subsidiary that leases EBS spectrum from educational institutions.

11. Defendant LCCC is a public community college in Elyria, Ohio, with its main address at 1005 N. Abbe Road, Elyria, Ohio 44035. Accordingly, LCCC is a citizen of Ohio and no other state.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and the claims are between citizens of different states. Plaintiff Clearwire II is a citizen of Delaware, Washington, and no other state. Defendant LCCC is a citizen of Ohio and no other state.

13. Personal jurisdiction is proper over LCCC in this district because LCCC exists in Ohio, its principal place of business is in Ohio, and it committed the acts complained of in Ohio.

14. Venue is proper in this court under 28 U.S.C. § 1391(b) because LCCC resides in this District, a substantial part of the events giving rise to the claim occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District.

## STATEMENT OF THE CASE

### A. The License to the Cleveland Spectrum

15. LCCC has long held a license to use four unique channels of radio-frequency spectrum in the Cleveland, Ohio, area. The channels are designated G1, G2, G3, and G4 under FCC "call sign" WHR777.

16. The licensed channels are part of the EBS, which is a range of spectrum that the FCC historically has licensed to educational and/or non-profit organizations.

17. There are 20 EBS channels in any particular geographic area. They fall within the band of spectrum from 2496 to 2690 MHz, commonly referred to as the "2.5 GHz" spectrum band.

18. Prior to April 2020, FCC regulations allowed only non-commercial entities that provided educational services to hold EBS spectrum licenses. *In re Transforming the 2.5 GHz*

5

*Band*, 34 FCC Rcd. 5446, 5448 (2019), 2019 WL 3065514. The FCC, however, permitted EBS licensees—most of which lack the technical knowledge, expertise, and infrastructure to operate a telecommunications network—to lease all but five percent of the spectrum authorized by their licenses to commercial entities like Clearwire II. *See id.* As of 2019, nearly all of the 1,300 EBS licensees had leased their excess capacity. *See id.* These leases took spectrum that otherwise would have gone unused and put it to work supporting modern, high-speed broadband and telecommunications services. *See id.*

### B. The October 2007 Lease Agreement

19. On October 22, 2007, LCCC and Clearwire II entered into a Lease Agreement for the spectrum capacity authorized by the License for three of the licensed channels (G1, G2, and G3). *See* Ex. A. The Lease Agreement's maximum term is through 2037.

20. The parties operated under the Lease Agreement for the first 15 years of its duration without incident.

21. Under the Lease Agreement, LCCC grants Clearwire II the right to use three of the Channels under the License in exchange for an initial fee and monthly payments during the term. Clearwire II has timely made all of these payments without issue.

22. The Lease Agreement contains an exclusivity provision that, as relevant here, prohibits LCCC from "negotiat[ing] with or contract[ing] with any third party to lease, sell, assign, transfer or use any of the capacity of the Channels." Ex. A § 3(a). This provision prohibits LCCC from transferring, or negotiating to transfer, the License to anyone other than Clearwire II.

23. The only exception is that, "if [Clearwire II] notifies Licensee that it has elected not to renew the Agreement, in accordance with Section 1(b), Licensee shall have the ability during the ninety (90) days immediately preceding the effective date of such termination to negotiate and

contract with any third party with respect to any period following the end of this Agreement, so long as Licensee complies with the Right of First Refusal set forth in Section 3(b)." *Id.*

24. In agreeing to the exclusivity provision in Section 3(a), LCCC promised Clearwire II that LCCC would be the exclusive holder of the License for the entire duration of the term, unless Clearwire II elected not to renew the lease.

25. Clearwire II has not notified Licensee that it has elected not to renew the Lease Agreement. To the contrary, Clearwire II intends to continue performing under that agreement for the entire lease term, as it may be extended from time to time.

      **C.**      **The FCC Changes the Rules for Holding EBS Licenses**

26. Effective April 27, 2020, the FCC eliminated the educational-use requirement for EBS licenses, thereby permitting commercial entities to hold such licenses. According to the FCC, this change was enacted because "technological changes over the last 30 years enable any educator with a broadband connection to access a myriad of educational resources." *In re Transforming the 2.5 GHz Band*, 34 FCC Rcd. at 5451. Hence, "[o]nly a handful of EBS licensees ha[d] deployed their own networks or use[d] their EBS licenses in a way that require[d] dedicated spectrum." *Id.* Instead, most licensees "rel[ied] on lessees [such as Clearwire II] to deploy and operate broadband networks and use[d] the leases as a source for revenues or devices." *Id.*

27. WCO is a private company owned and controlled by billionaire Gary Winnick. *See About WCO Spectrum LLC*, WCO SPECTRUM, https://www.wcospectrum.com/about-wco-spectrum (last visited Mar. 27, 2023). WCO portrays itself as an "investor" in EBS spectrum licenses. Since the FCC rule change, WCO has sent at least dozens of institutions "Non-Binding Term Sheets" in which it purportedly offered to buy their EBS licenses, without regard for whether the terms of the underlying contracts permit such purchases.

7

### D. WCO Makes Its First Non-Binding Offer to LCCC

28. On May 10, 2021, WCO apparently made its first entreaty to LCCC about a potential purchase of its License.

29. On August 10, 2021, LCCC, through its outside counsel, Louis J. Licata, Esq., informed Heather Brown, Esq., in-house counsel for Clearwire II, that it had received an "unsolicited" offer to purchase the License. Mr. Licata stated that he represented LCCC in a "potential transaction" involving the License.

30. Later that day, Mr. Licata provided Ms. Brown with a copy of the purported "offer letter" LCCC had received. The letter, which was one-page long and dated May 10, 2021, showed that the purported offeror was WCO and that the purported offer was for $14.75 million. The offer was for the entire License WHR777 and did not specify individual Channels.

31. In late 2021, in discussions with Clearwire II, LCCC suggested that Clearwire II should offer $18 million for the License. Clearwire II declined to pay that amount.

### E. WCO Makes a Second, Higher Non-Binding Offer to LCCC

32. More than one year later, and after further discussions and negotiations between LCCC and WCO, on March 16, 2023, Lee G. Petro, Esq., another lawyer for LCCC, notified Clearwire II that LCCC had received a new, higher non-binding offer from WCO for the License, this time for $20.1 million. This amount was approximately 10% more than the $18 million LCCC previously had suggested it would accept in discussions with Clearwire II.

33. The materials provided by LCCC showed that WCO sent an offer to LCCC to purchase the License (again covering all four channels) for $20.1 million on January 12, 2022. On March 25, 2022, LCCC's Board of Trustees supposedly considered WCO's purported offer and voted to authorize LCCC staff to execute any documents "necessary to effectuate and finalize the transaction." LCCC then had further discussions with WCO, and received a purported offer letter

8

from WCO on March 28, 2022. A short time later, LCCC entered into agreements with WCO that WCO demanded as part of their negotiation. Indeed, Clearwire II has learned recently that LCCC and WCO negotiated and entered into a so-called Commitment Cost Agreement on July 20, 2022. The Commitment Cost Agreement provides that if Clearwire II were to match WCO's purported offer and purchase the License for $20.1 million, then LCCC would owe WCO $2.01 million (10% of the purchase price), with LCCC netting about $18 million (the amount it was seeking in negotiations). After entering into that contract with WCO, LCCC subsequently requested a "Proof of Funds Letter" from WCO. In further discussions between LCCC and WCO, WCO supposedly promised to provide LCCC with such a letter by August 5, 2022, but failed to do so. Even though WCO missed that deadline, LCCC engaged in additional discussions with WCO, and WCO eventually provided a letter to LCCC seven months later in early 2023.

34. After that extended back and forth between LCCC and WCO, in March 2023, LCCC informed Clearwire II that LCCC intended to accept WCO's purported $20.1 million offer—which unlike before, LCCC notably did not describe as "unsolicited"—unless Clearwire II provided notice that it intended to match the offer "within thirty (30) days," or by April 15, 2023.

35. In direct breach of Section 3(a), LCCC is attempting to foist upon Clearwire II a choice that it specifically contracted to avoid: Either pay more than $20 million to acquire the License or have WCO acquire the License. This choice is a direct derogation of Clearwire II's exclusivity right.

F. **Clearwire II Unsuccessfully Tries to Resolve Its Dispute with LCCC**

36. On March 27, 2023, Clearwire II, through outside counsel, formally notified LCCC that it was in breach of the exclusivity provision contained in Section 3(a) of the Lease Agreement because it had negotiated to sell, and threatened to sell, the License to a third party even though Clearwire II had not notified LCCC of an intention to not renew its Lease Agreement. Clearwire

9

II also sought LCCC's assurance that it would not proceed with any transaction for the License with WCO. LCCC, however, refused and indicated, without addressing its exclusivity obligation, that it would sell the License to WCO shortly after April 15, 2023, unless Clearwire II matched the offer.

37. On April 5, 2023, counsel for Clearwire II reached out to request a 30-day extension of the alleged deadline for Clearwire to respond to LCCC. On April 7, 2023, LCCC responded that it would only agree to this short extension of time if Clearwire agreed to (1) "waive all rights in equity or law against [LCCC]" related to WCO's purported offer, and (2) pay LCCC at least $22.11 million for the License if it chooses to match WCO's offer—*i.e.*, $2.01 million more than WCO's purported offer.

38. Now, as a last resort, Clearwire II brings this action based on LCCC's breach of the exclusivity provision contained in Section 3(a) of the Lease Agreement.

## CLAIMS FOR RELIEF

### COUNT I
### (Breach of Contract – Exclusivity)

39. Clearwire II repeats and realleges the allegations set forth above as though fully set forth herein.

40. The Lease Agreement constitutes a valid and enforceable contract between LCCC and Clearwire II.

41. Clearwire II complied with all conditions precedent and fully performed its obligations under the Lease Agreement.

42. LCCC has breached Section 3(a) of the Lease Agreement.

10

43. Section 3(a) provides that, "[d]uring the Term, Licensee will not negotiate or contract with any third party to lease, sell, assign, transfer or use any of the capacity of the Channels or any option therefore." Ex. A § 3(a).

44. This exclusivity provision states, however, that "if [Clearwire II] notifies Licensee that it has elected not to renew the Agreement, in accordance with Section 1(b), Licensee shall have the ability during the ninety (90) days immediately preceding the effective date of such termination to negotiate and contract with any third party with respect to any period following the end of this Agreement, so long as Licensee complies with the Right of First Refusal set forth in Section 3(b)." *Id.*

45. Clearwire II did not notify Licensee of an election not to renew the Agreement, and thus the sole exception to the exclusivity provision does not apply.

46. Because LCCC negotiated to sell, and has threatened and seeks to sell, the License to a third party, WCO, it is in breach of Section 3(a).

47. Clearwire II has been injured by LCCC's breach of its legally enforceable obligations under the Lease Agreement.

## COUNT II
### (Declaratory Judgment)

48. Clearwire II repeats and realleges all of the allegations of the preceding paragraphs as if they were fully set forth herein.

49. The Court may declare the rights and legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there is a case of actual controversy between Clearwire II and LCCC regarding the parties' rights and obligations under the Lease Agreement.

50. Section 3(a)'s exclusivity provision provides that "[d]uring the Term, Licensee will not negotiate or contract with any third party to lease, sell, assign, transfer or use any of the capacity of the Channels or any option therefore." Ex. A § 3(a).

51. Because LCCC is not permitted to proceed with the proposed sale of the License, LCCC is not permitted to "accept" the purported offer from WCO. Lease Agreement § 3(b).

52. Accordingly, Clearwire II respectfully requests a judgment declaring that LCCC is prohibited from selling the License to WCO.

## PRAYER FOR RELIEF

WHEREFORE, Clearwire II prays for relief and judgment against Defendant as follows:

A. Order necessary and appropriate injunctive relief, including a permanent/final injunction preventing LCCC from selling, transferring, or assigning the Licenses to WCO or any of its affiliates unless and until Clearwire II indicates it will not renew the Lease and the Lease is in its final 90 days, or unwinding any such transaction to the extent LCCC already has purported to effect it;

B. Declare that LCCC is prohibited from selling, transferring, or assigning the License to WCO or any of its affiliates unless and until Clearwire II notifies LCCC that it will not renew the Lease and the Lease is in its final 90 days;

C. Pursuant to Section 21(f) of the Lease Agreement, award Clearwire II all attorney's fees and expenses that relate to its pursuit of this litigation and the preceding dealings with LCCC and WCO;

D. Award Clearwire II all costs and interests allowed by law;

E. Award Clearwire II such other relief as the Court deems just and reasonable; and

F.  Provide Clearwire II with the right to amend this complaint in the event the Court determines Clearwire II has failed to adequately plead the foregoing claims against LCCC or as other events may warrant.

Dated:  April 14, 2023               Respectfully submitted,

*/s/ Jill G. Okun*
JILL G. OKUN (0034477)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, OH 44113
Telephone: (216) 443-2508
Facsimile: (216) 443-9011
Email: jokun@porterwright.com

KENNETH J. BROWN*
R. KENNON POTEAT III*
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
Email: kbrown@wc.com
Email: kpoteat@wc.com

* *pro hac vice* forthcoming

*Attorneys for Plaintiff*